# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 18-1513V
UNPUBLISHED

| | |
|---|---|
| JULIA RANDAZZO,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: February 1, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Leah VaSahnja Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.

*Darryl R. Wishard*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION AWARDING DAMAGES[1]

On September 28, 2018, Julia Randazzo filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 4, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

The matter was conceded, leaving only the issue of what damages to be permitted. For the reasons described below, I find that Petitioner is entitled to an award of damages

---

[1] Although I have not formally designated this Decision "for publication," I am required to post it on the United States Court of Federal Claims' website because it contains a reasoned explanation for the action in this case, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

in the amount **$125,360.00**, **representing $125,000.00 for pain and suffering, and $360.00 for past unreimbursable expenses.**[3]

## I.     Relevant Procedural History

On September 28, 2018, Petitioner filed a claim seeking compensation for a left SIRVA. ECF No. 1. On August 8, 2019, Respondent filed his Rule 4(c) report conceding that Petitioner is entitled to compensation. Respondent's Rule 4(c) Report at 1. A ruling on entitlement issued on August 9, 2019. ECF No. 21. The parties thereafter began informally discussing damages, but were unsuccessful, and therefore requested a pain and suffering hearing. ECF No. 36, Scheduling Order filed April 17, 2020.

I ordered the parties to submit briefs prior to setting a hearing date. *Id.* Petitioner filed a motion for a ruling on the record regarding damages on June 22, 2020. ECF No. 38, Petitioner's Motion for Ruling on the Record Regarding Damages ("Pet. Mot."). Respondent filed a response on June 26, 2020. ECF No. 39, Response to Motion for Ruling on the Record Regarding Damages ("Res. Resp."). Petitioner filed a reply on July 6, 2020. ECF No. 40, Petitioner's Reply to Respondent's Brief on Damages ("Pet. Reply"). Based upon my review, I believe it would be appropriate to decide this case on the record instead of an expedited hearing.

The issue is now ripe for adjudication.

## II.     Relevant Medical History

On October 4, 2017 Petitioner received a flu vaccine in her left deltoid. Ex. 1 at 2. Approximately three weeks later, Petitioner presented to Dr. Ahmed Khan on October 25, 2017 for left shoulder pain. Ex. 2 at 39. Petitioner stated that she received a flu shot on October 4th and that her left deltoid had been "[h]urting since then." *Id.* at 40. Petitioner rated her pain as 6 out of 10 and noted she had limited range of motion and activity. *Id.* She was assessed with a strain of the deltoid muscle with spasms and point tenderness. *Id.*

On November 22, 2017, Ms. Randazzo was again seen by Dr. Kahn for follow-up of left shoulder pain. Ex. 2 at 50. Dr. Kahn noted that there was no improvement in Petitioner's left shoulder, and she continued to suffer from pain and limited range of motion. *Id.* at 51. She rated her pain as 6 out of 10 in the morning, but 8 out of ten throughout the day. *Id.* Petitioner was assessed with myositis of left shoulder and post-injection myositis, and prescribed prednisone. *Id.* at 52.

---

[3] The parties agree on amounts for out-of-pocket medical expenses.

Ms. Randazzo was next seen on January 3, 2018. Ex. 2 at 55. Upon examination, Petitioner's shoulder showed limited range of motion and was assessed with chronic left shoulder pain. *Id.* at 56. Then, on February 12, 2018, Petitioner saw Dr. Saad Hussein at Michigan Orthopedic Specialists for left shoulder pain. Ex. 3 at 14. She reported that her pain started after she received a flu shot and rated it as 7 out of 10. *Id.* Upon examination Petitioner's left shoulder exhibited minor reduction in strength and reduced range of motion. *Id.* at 15.

An MRI examination on February 23, 2018 revealed low grade bursal sided partial-thickness tear of the supraspinatus superimposed on tendinosis. Ex. 3 at 33. Additionally, there were signs of acromioclavicular arthritis, adhesive capsulitis, and "mild subacromial/subdeltoid bursitis." *Id.* Ms. Randazzo saw Dr. Hussein again on March 5, 2018. At that time she continued to complain of left shoulder pain, rating at "7-8/10." *Id.* at 7. Petitioner was assessed with shoulder pain, adhesive capsulitis, and subacromial impingement syndrome. *Id.* at 9. Treatment options were discussed, including surgical procedures.

On April 3, 2018, Ms. Randazzo underwent surgery on her shoulder, including manipulation under anesthesia, arthroscopic lysis of adhesions, and arthroscopic subacromial decompression. Ex. 4 at 5. Petitioner's initial physical therapy evaluation occurred the next day. Petitioner rated her pain as 8 out of 10, and stated she had experienced a progressive decline in function for many months. Ex. 5 at 1. Between April 4, 2018 and May 22, 2018, she attended 22 physical therapy sessions. *Id.* at 1-32. The progress notes indicate steady progress in increasing her strength and range of motion, and decreasing pain. *See* Ex. 5 at 30 (reporting pain level of 8 out of 10 on April 6, 2018) and Ex. 5 at 11 (reporting pain at 3 out of 10 and other improvements on May 22, 2018).

Petitioner saw Dr. Hussain for a follow-up on her left shoulder on July 23, 2018. Ex. 7. At that time, she reported some stiffness and night pain, and rated her pain as 6-7 out of 10. *Id.* at 1. Upon examination, she exhibited full strength and range of motion, and was assessed as "[d]oing well overall". *Id.* at 2.

There is a large gap in the records, with Ms. Randazzo not seeing a treater until January 2020, when saw her primary care provider for several issues, including "acute pain in left shoulder. Ex. 10 at 1.[4] On February 3, 2020, she again complained of shoulder pain. At that time, she reported "a very good return of function following the [surgical repair], and … only had intermittent discomfort." Ex. 9 at 1. However, two to three months earlier her pain returned. *Id.* Upon examination, Petitioner showed a reduction in range

---

[4] Petitioner did not file the actual office notes for this visit, but a summary. Ex. 10 at 1.

of motion but full no reduction in strength. *Id.* at 4. Petitioner was assessed with rotator cuff tendinitis, arthritis, and cervical radiculopathy. *Id.* at 5.

Petitioner next complained of shoulder pain on March 2, 2020 where an evaluation showed continued reduction in range of motion and strength. Ex. 9 at 9. She was now diagnosed with arthritis of the left glenohumeral joint. *Id.* At that time her doctor hypothesized that "there may be a component of frozen shoulder and she received a corticosteroid injection. Additional physical therapy was prescribed, and Petitioner mentioned attending physical therapy, however no additional physical therapy records were filed.

### III.     Affidavits

Ms. Randazzo submitted an affidavit in support of her claim on November 27, 2018. Ex. 6. She asserts she experienced severe pain at the time the vaccine was injected. *Id.* at 1. She further stated that the pain continued, and she ultimately underwent surgery on April 3, 2018. *Id.* at 2. Petitioner also claims that "[t]he surgeon told me that it was quite a mess inside the shoulder and that he did everything he could except for repairing a small tear that he decided to leave alone at the time because it was so small and the other things that were wrong took precedence over that." Further, Petitioner stated that the pain lingered for months, and was still present as of November 27, 2018. *Id.* at 2-3. Petitioner also explained that her injury negatively affected the relationship with her husband, and exacerbated her underlying depression. *Id.* at 3.

### IV.     The Parties' Arguments

Petitioner requests an award of damages in the amount of $145,360.00, consisting of $145,000.00 for pain and suffering, plus $360.00 for out-of-pocket medical expenses (although that sum is not in dispute).[5] Petitioner argues that her pain and dysfunction was severe in this case, especially in the first year after her vaccination. Pet. Mot. at 9. Ms. Randazzo rated her pain as 6-7 out of 10 in the months immediately following her vaccination, with reduced range of motion and ultimately surgical intervention. *Id.* at 9-10. Petitioner also argues that her shoulder issues in 2020 "are related, *at least in part*, to her SIRVA." *Id.* at 11. Petitioner further argues that, while the surgery was considered successful, she still has pain and loss of function. *Id.* at 11. Additionally, Ms. Randazzo describes how the injury affected other aspects of her life, including aggravating her pre-existing depression. *Id.* at 12.

---

[5] Respondent proposed $360.00 for out-of-pocket medical expenses. Res. Rep. at 1.

Respondent proposes a pain and suffering award of no more than $85,000.00. Res. Resp. at 1. Respondent argues that the majority of Petitioner's treatment occurred over only a nine-month period, and consisted of a steroid injection, physical therapy sessions, oral steroids, and surgery. Res. Mot. at 5. Respondent further argues that "[g]iven the gap in time and the lack of any medical opinion evidence … attributing her recent acute left shoulder pain to her SIRVA, all care and treatment after July 2018 should not be considered as relevant…." Res. Resp. 5. Respondent also discussed the large number of proffered awards in SPU cases, awards for shoulder injuries in the traditional tort system which appear to be substantially lower, and a "meeting-in-the-middle" method that Respondent believes is being utilized by the special masters when determining the appropriate amount of damages to be awarded. *Id.* at 5-8; Appendix A to Res. Resp. (list of traditional tort system cases).

Respondent argues that it is appropriate to refer to other decisions regarding pain and suffering damages as an aid to determining the proper amount. Res. Resp. at 6. In her reply, Petitioner disagrees, arguing that the "Chief Special Master is to examine two factors, and two factors only when determining pain and suffering and emotion distress: the facts of each case before him (subject to a cap of $250,000) and the Congressional desire for petitioners to be compensated generously." Pet. Reply at 2.

V.      **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity

of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that doing so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579, 590 (2013). Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* does not control this matter's outcome, it remains a persuasive determination.

### VI. Appropriate Compensation for Petitioner's Pain and Suffering

#### A. General Guidance for Analysis

The guidance provided by the *Graves* decision is clear, and I have previously addressed the more general arguments made by Respondent during expedited motions

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

days and in other damages decisions. While noting that this end result may occur in some cases (and disappoint both sides as a result), I have in fact rejected the "meeting-in-the-middle" method Respondent claims is often used, based on the proposition that "each petitioner deserves an examination of the specific facts and circumstances in her or his case. *Sakovits v. Sec'y of Health & Human Servs.,* No. 17-1028V, 2020 WL 3729420, at *3 (Fed. Cl. Spec. Mstr. June 4, 2020). I also have rejected Respondent's argument that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters. *Id.* at *4. While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Id.* (emphasis in original). Taken as a whole, however, the data from these decisions can be a helpful gauge of the compensation being awarded in SPU SIRVA cases.

I have not previously given great weight to Respondent's citation to pain and suffering determinations from traditional tort system state court cases, noting that Congress intended the "no-fault" system established in the Vaccine Program to be generous. H.R. REP. NO. 99-908, at 12-13 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6353-54. Thus, Vaccine Program compensation will likely be greater than those awarded in civil actions. Additionally, the descriptions of the traditional tort system cases proposed by Respondent often lack basic information needed for comparison. *Rafferty v. Sec'y of Health & Human Servs.*, No. 17-1906V, 2020 WL 3495956, at *18 (Fed. Cl. Spec. Mstr. May 21, 2020). As a result, "SIRVA awards in the Vaccine Program are self-evidently more relevant and apposite." *Id.*

### B.     Prior SIRVA Compensation Within SPU[7]

#### i. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2021, 1,874 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 1,820 of these cases, with the remaining 54 cases dismissed.

Of the compensated cases, 1,058 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 47 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously

---

[7] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[8]

1,011 of this subset of post-entitlement determination, compensation-awarding cases were the product of informal settlement - 987 cases via proffer and 24 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or in sight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits*, 2020 WL 3729420, at *4 (emphasis in original).

The remaining 762 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many of which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered[9] Damages** | **Stipulated Damages** | **Stipulated[10] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 47 | 987 | 24 | 762 |
| **Lowest** | $55,619.60 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $75,044.44 | $74,040.17 | $90,000.00 | $47,500.00 |

---

[8] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[10] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| Median | $86,784.56 | $93,975.95 | $115,214.49 | $65,000.00 |
|---|---|---|---|---|
| 3rd Quartile | $125,000.00 | $120,390.74 | $153,788.29 | $91,250.53 |
| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $509,552.31 |

### ii. Pain and Suffering Awards in Reasoned Decisions

In the 47 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $55,000.00 to $185,000.00, with $85,000.00 the median amount. Only four of these cases involved an award for future pain and suffering, with yearly awards range from $500.00 to $1,000.00.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in ROM, and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. These SIRVAs usually resolved after one to two cortisone injections and two months or less of PT. None required surgery. The duration of the injury ranged from six to 29 months, with petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 50 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In three cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

---

[11] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

### C. Specific Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of petitioner's injury.

When performing the analysis in this case, I reviewed the record as a whole to include the medical records, the affidavit, and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The medical records support Ms. Randazzo's claim of immediate pain upon vaccination that subsequently persisted for approximately ten months. Further, Petitioner's pain was moderate to severe, consistently described as between 6 to 8 out of 10 for the six months following her vaccination.[12] However, she also consistently exhibited normal or almost normal strength, and the reduction in her range of motion ("ROM") not significant. Petitioner ultimately underwent surgical intervention consisting of manipulation under anesthesia and subacromial decompression. Ex. 4 at 5. Following her surgery and physical therapy her condition improved, reporting much less pain (3 out of 10) by May 22, 2018, or eight months after her vaccination. Ex. 5 at 11.[13] Petitioner was assessed as "[d]oing well overall" in July of 2018, although she still rated her pain as 6-7 out of 10. Petitioner later indicated that the surgery was successful, reporting in 2020 that she had a very good return to function following her surgery and only experienced intermittent discomfort. Ex. 9 at 1.

Overall, the circumstances in Petitioner's case are most like those experienced by another petitioner awarded $125,000.00 for her past pain and suffering. *Nute v. Sec'y of Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008, at *1, 12-13 (Fed. Cl. Sept. 6, 2019). Initially the *Nute* petitioner's pain was severe, reported to be 8-10 on a scale of 10. After a second cortisone injection, performed two months after vaccination, that petitioner obtained some relief. *Id.* at *2. But her pain returned to the previous levels within four months, remaining at that level until her surgery two months later. *Id.* at *3. Additionally, the *Nute* petitioner's surgery was more extensive than what Ms. Randazzo experienced – although it also proved more effective than the present case, since

---

[12] *See* ex. 2 at 40 (record from October 4, 2017 describing her pain as 6 out of 10); Ex. 3 at 14 (record from February 12, 2018 describing her pain as 7 out of 10); *id.* at 7 (record from March 5, 2018 describing her pain as 7-8 out of 10).

[13] However, Petitioner also reported pain as 6-7 out of 10 in July of 2018. Ex. 7 at 1-2.

10

Petitioner still reported pain four months after her procedure. The overall mix of facts herein supports an award in that range, and thus higher than what Respondent proposes.

At the same time, however, I am not persuaded by Petitioner's claim that her 2020 shoulder issues are related, at least in part, to her 2018 SIRVA (Pet. Mot. at 9, 11) because this aspect of her claim is not supported by her medical records. For the 18-month period from late July 1018 until January 2020, Petitioner sought no treatment at all for the left shoulder pain she maintained she was experiencing – undermining claims that the SIRVA remained unresolved. Further, the records indicate that when she did seek treatment in 2020, she reported that the surgical procedure was successful, and her pain only returned in November of December of 2019. Ex. 9 at 1 (record from February 3, 2019, reporting that Petitioner "had a very good return of function following the [surgical repair]…. Starting 2-3 months ago the patient began to have pain which felt like her previous pain."). Petitioner has not established that her shoulder pain and/or injury described in 2020 is associated or related to the SIRVA she stopped seeking treatment for in July of 2018, and thus this is not a factor I give much weight in setting a proper pain and suffering award in this case.

### VII. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $125,000.00 represents a fair and appropriate amount of compensation for Petitioner's pain and suffering. I also find that Petitioner is entitled to $360.00 for her unreimbursed out-of-pocket expenses.**

**I thus award Petitioner a lump sum payment of $125,360.00, representing $125,000.00 for her pain and suffering, $360.00 for her actual unreimbursable expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this decision.[14]

**IT IS SO ORDERED.**

                              <u>s/Brian H. Corcoran</u>
                              Brian H. Corcoran
                              Chief Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.